**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

SOUTHWEST AIRLINES CO.,

     Plaintiff,

 v.

SCOTT MOSS, in his official capacity as Director
of the Division of Labor Standards and Statistics at
the Colorado Department of Labor and Employment,
and PHILIP J. WEISER, in his official capacity as
Attorney General, Colorado.

     Defendant.

No. _____

**COMPLAINT FOR
DECLARATORY
JUDGMENT**

## I. INTRODUCTION

1. The Colorado Healthy Families and Workplaces Act (C.R.S. §§ 8-13.3-401 *et seq.*)
and rules promulgated thereto  (the "HFWA" or the "Law"), as interpreted by the Colorado
Department of Labor and Employment ("CDLE") and applied to Southwest Airlines Co.
("Southwest") by the CDLE, is preempted by the Airline Deregulation Act (49 U.S.C. § 41713)
(the "ADA"), violates the Commerce Clause of the United States Constitution (U.S. Const. art. I,
§ 8, cl. 3), and is preempted by the Railway Labor Act (45 U.S.C. §§ 151 *et seq.*) (the "RLA").

2. Southwest is an employer in Colorado and the CDLE has found that it is subject to
the HFWA across all its Colorado operations, including Colorado-based flight attendants and
pilots.  The HFWA imposes a pervasive and comprehensive paid sick leave scheme on employers
in Colorado, including a requirement to provide accrued paid sick leave at the rate of one hour per
30 hours worked up to 48 hours per year, which can be used for medical needs of employees and
their families, and to provide up to two weeks of paid leave for Covid-related needs for employees
or their families.  The HFWA also precludes employers from requiring medical documentation for
absences that are shorter than four consecutive days.  While the HFWA exempts employers that

have collective bargaining agreements ("CBAs"), the CDLE's enforcement position is that this exemption only applies if the CDLE determines that the negotiated and agreed terms of the CBAs cover all of the same conditions or needs, at the same pay rate, and with no stricter requirements. The CDLE has held that Southwest's CBAs do not meet these requirements and that Southwest cannot avail itself of this exemption.

3.     Southwest is an air carrier under the RLA, which imposes a duty on air carriers and employees to exert every reasonable effort to make and maintain collective bargaining agreements with unions duly certified under the RLA.  As a result of collective bargaining with these unions, Southwest already provides generous paid sick leave benefits to its Colorado-based employees (and its employees generally), and has done so for decades.  Southwest has negotiated these benefits in nationwide CBAs applicable to each nationwide work group in accordance with the RLA, and these comprehensive bargained-for benefits allow flight and ground crews to take time away from work to, for example, attend medical appointments and recover from an illness or injury.  In exchange for these benefits, Southwest has preserved the right under the CBAs to monitor attendance and reliability in order to ensure, among other things, that sick leave benefits are not abused, and that flight crews and ground employees are in compliance with federal regulations governing duty period limitations, family medical leave, rest requirements, and aviation safety, as well as to facilitate timely operations and services.  The HFWA directly contradicts, and prevents enforcement of, these carefully negotiated CBA provisions.

4.     The ADA preempts the HFWA because the HFWA relates to and significantly impacts Southwest's prices, routes, and services.  Among other effects, the HFWA significantly impacts Southwest's services by severely constraining Southwest's ability to monitor and prevent abuse of sick leave.  Sick-leave abuse, in turn, already causes flight delays and cancellations.  So

the effect of applying the HFWA to Southwest will be additional flight delays and cancellations. The HFWA also will, *inter alia,* require Southwest to increase its headcount to cover the increased absences, which necessarily will increase Southwest's prices.

5.    The HFWA violates the Dormant Commerce Clause ("DCC") because the burdens it imposes on Southwest and interstate commerce substantially outweigh the minor, incremental benefits resulting from applying the HFWA to Southwest.  As just explained, the burden to interstate commerce that results from complying with the HFWA will be significant.  But the benefit of the law, as applied to Southwest, is minimal, because Southwest already provides generous paid leave benefits through CBAs negotiated with its unions.  Further, if Colorado is allowed to impose a comprehensive sick leave scheme with regard to employees subject to nationally applicable CBAs, then other states and municipalities can as well.  Indeed, at least thirty-seven (37) state and local jurisdictions currently require and regulate paid sick leave.  These various regimes impose different (and inconsistent) obligations on Southwest's operations, including flight operations across multiple state borders.  The task of untangling this snarl of conflicting paid sick leave rules imposes a substantial and unconstitutional burden on Southwest, and in turn on interstate commerce, in violation of the Dormant Commerce Clause.

6.    The RLA preempts the HFWA because the HFWA impermissibly "stands as an obstacle to accomplishment and execution of the full purposes and objectives of Congress" when it enacted the RLA.  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  The principal goal of the RLA is to "provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions," and to require that the parties "make and maintain collective bargaining agreements…to avoid any interruption to commerce or to the operations of a carrier engaged therein."  45 U.S.C. § 151a.  The HFWA, as interpreted and applied by the CDLE to Southwest,

frustrates those stated goals of the RLA by imposing a pervasive paid leave scheme that disrupts crucial elements of Southwest's existing CBAs in a manner that undermines reliance and trust in the CBAs, and is thus inherently destructive of the integrity of the RLA bargaining process itself. This will lead inevitably to delayed and disorderly settlement of disputes (including reaching of agreements) between Southwest and its unions concerning terms of employment, now and in the future, in a manner directly inconsistent with Congress' stated goals in the RLA.  And such delay and disorder in settling disputes (and reaching of agreements) will, in turn, inevitably lead to increased disruption of commerce and operations, also in a manner directly inconsistent with the Congress' stated goals in the RLA.

7.      As detailed below, Southwest seeks declaratory relief to invalidate the HFWA and to prohibit its enforcement with respect to Southwest.

II.     **NATURE OF ACTION**

8.      Plaintiff Southwest seeks a declaration, pursuant to 42 U.S.C § 1983 and 28 U.S.C. §§ 2201 and 2202, that the ADA preempts the HFWA as applied to Southwest because it relates to Southwest's prices, routes, and services

9.      Southwest seeks a declaration, pursuant to 42 U.S.C § 1983 and 28 U.S.C. §§ 2201 and 2202, that the HFWA violates the Dormant Commerce Clause of the United States Constitution because it substantially impairs interstate commerce when a national, uniform system of regulation is required.

10.     Southwest seeks a declaration, pursuant to 42 U.S.C § 1983 and 28 U.S.C. §§ 2201 and 2202, that the RLA preempts the HFWA as applied to Southwest because it creates an obstacle to the collective bargaining process and thwarts the purposes of the RLA.

## III.   PARTIES

11.     Plaintiff Southwest is a commercial air carrier incorporated in the State of Texas with its headquarters located in Dallas, Texas.  Southwest is a "carrier" as defined by the RLA. Southwest operates at Colorado airports and has a flight crew and maintenance base at the Denver International Airport (DEN).  Southwest is currently a party to enforcement proceedings by the CDLE, which has refused to consider the preemption and DCC issues alleged herein.  The CDLE has already found that the HFWA applies to Southwest's operations in Colorado, that the collective bargaining agreement exemption does not apply, and that Southwest is currently operating in violation of the HFWA.  The CDLE has issued a citation which purports to require Southwest to pay over one million three hundred and thirty thousand U.S. dollars ($1,330,000.00) and substantially change its policies and procedures concerning paid sick leave, including numerous policies that were the result of collective bargaining under the RLA and are currently set out in CBAs.  Absent relief from this Court, Southwest is and will continue to be subjected to the HFWA.

12.     Defendant Scott Moss is the Director of Labor Standards and Statistics at the Colorado Department of Labor and Employment and named in his official capacity.  In his role, he is charged with enforcement of the HFWA.  *See* C.R.S. § 8-13.3-411.

13.     Defendant Philip J. Weiser is the Attorney General for the State of Colorado, and is named in his official capacity.  As Attorney General, he is charged with enforcing the laws of Colorado.

## IV.   JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, because Plaintiff Southwest's claims arise under the United States Constitution – specifically,

FP 44133269.1

Art. I, Sec. 8, Cl. 3 (the "Commerce Clause") and Art. VI, Cl. 2 (the "Supremacy Clause") – as well as the ADA and RLA, Acts of Congress regulating air carriers.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as this Court is located in the judicial district where a substantial part of the events or omissions giving rise to Southwest's claims have occurred, are now occurring, and will occur in the future; and because Defendant resides or is found in this judicial district.

## V.     FACTUAL BACKGROUND

**FLIGHT CREW**

16.     Southwest is a federally-regulated air carrier and operates domestic and international flights daily out of airports in Colorado, including DEN.

17.     As used herein, the term "flight crew" refers to pilots and flight attendants, and the term "ground crew" includes (but is not limited to) mechanics, fleet service workers, customer service agents, flight dispatchers, baggage handlers, and catering employees.  There are twelve distinct unionized work groups based in Colorado, all of which are represented in collective bargaining by unions and are covered by existing collective bargaining agreements.  By way of example:

      a.  Southwest's pilots are represented by the Southwest Airline Pilots Association, and are covered by a collective bargaining agreement that is currently being renegotiated;

      b.  Southwest's flight attendants are represented by the Transport Workers Union of America Local, AFL-CIO Local 556, and are covered by a collective bargaining agreement that is currently being renegotiated;

c.  Southwest's dispatchers are represented by the Transport Workers Union of America, AFL-CIO Local 550, and are covered by a collective bargaining agreement that is that is currently being renegotiated;

d.  Southwest's material specialists are represented by the International Brotherhood of Teamsters, and are covered by a collective bargaining agreement that is subject to renegotiation in April 2024;

e.  Southwest's mechanics are represented by the Aircraft Mechanics Fraternal Association, and are covered by a collective bargaining agreement that is subject to renegotiation in April 2024;

f.  Southwest's facilities maintenance technicians are represented by the Aircraft Mechanics Fraternal Association, and are covered by a collective bargaining agreement that opens for renegotiation in June 2022;

g.  Southwest's flight instructors are represented by the Transport Workers Union of America, AFL-CIO Local 557, and are covered by a collective bargaining agreement that is currently being renegotiated;

h.  Southwest's customer service agents and customer representatives are represented by the International Association of Machinists and Aerospace Workers, AFL-CIO, and are covered by a collective bargaining agreement that is currently being renegotiated; and

i.  Southwest's ramp, operations, provisioning, and freight agents are represented by the Transport Workers Union of America, AFL-CIO Local 555, and are covered by a collective bargaining agreement that is currently being renegotiated.

7

18.     Flight crews are highly mobile workers who do not work regularly scheduled shifts. Schedules vary widely and are determined by bidding processes that take into account flight crew preferences and seniority, Federal Aviation Administration ("FAA") mandated flight duty limitations, CBA limitations, and flight crew "domiciles" or "base" airports.  Typically, flight crews bid for available flight segments that begin and end at their domicile airports. Southwest domiciles flight crews at DEN.

19.     Southwest does not require flight crews to reside in the same city or state as their domicile airport.  Approximately half of Denver-based flight attendants, and approximately a quarter of Denver-based pilots, for example, reside in cities and states geographically distant from their domicile airport and commute to and from work by air travel.

20.     Flight crews have bargained in CBAs for the right to trade, add, and drop flights (without Southwest's control or even advance notice).  They also do not work a regularly scheduled shift flying between the same airports or with standard start and end times for their shifts.  Instead, they work fluctuating schedules that depend on seniority, bidding preferences and choices, regulatory requirements, CBA rules and limitations, and base assignments.  Flight crew trip pairings range from one to four (4)-day trip pairings for both flight attendants and pilots.  The majority of trip pairings for flight attendants are three (3) days or less.  Similarly, only twenty percent (20%) of trip pairings for pilots are for four (4) days.  Flight crew trip pairings frequently involve travel across multiple state borders and often involve layovers at various locations before returning to a crew member's domicile (or base) airport.

21.     FAA regulations set the minimum staffing levels for every commercial flight. Without the requisite number of flight crew members on board, a plane cannot take off.  If a scheduled crewmember unexpectedly calls out sick, a replacement crewmember must be found

8

through a process which often causes a delay in the flight's departure.  If a replacement crewmember cannot be found, either because of scheduling or because no reserve crewmembers are stationed at the relevant airport, the flight may be cancelled in its entirety.

22.     Pursuant to the terms of the applicable CBAs, Southwest calculates flight crew pay according to several different methods, many of which are not based on hours worked.

23.     For example, Southwest compensates flight attendants based on "trips for pay" or "TFP," which, pursuant to  the relevant CBA, is "based on point to point mileage," not on hours. Flights with nonstop mileage of two-hundred forty-three (243) miles or less are considered "standard" TFPs, and flights with nonstop mileage of more than two-hundred forty-three (243) miles are considered "non-standard" TFPs paid at a higher rate.  Southwest flight attendants are also entitled to additional pay due to a delay—such as if a flight is grounded and does not take off on time or if a flight operates in excess of the scheduled block time.  In such cases, they are paid a fraction of a TFP, not a particular rate per length of delay.  Flight attendant pay also fluctuates monthly according to several variables, including the number of duty periods in a sequence in a bid month, whether a flight attendant voluntarily swaps trips, the position in the aircraft the flight attendant works, and whether the flight attendant has worked flight segments in addition to the bid schedule.

24.     Flight crew unions have negotiated in CBAs for generous paid sick leave benefits, and have done so for decades before the HFWA was passed.  For example, Southwest flight attendants accrue sick leave at a rate of one (1) TFP for each ten (10) TFPs flown or credited during the month.  This accrual rate amounts to roughly 1 hour of sick leave for every 12 hours worked, which is far more generous than required by the HFWA — though the fact that TFP does not strictly convert to hours worked means that this approximation can vary based on actual hours

worked.  Unused sick leave accumulates up to a maximum of 2,400 TFP until a flight attendant resigns/retires or terminates—again, far more generous than the HFWA.  In addition, and again outside of the HFWA, flight attendants are entitled to seven (7) days off per quarter if they write their own sick note and to another fourteen (14) days with a doctor's note.  When flight attendants take sick leave, their sick leave bank is debited and the flight attendant is paid based on the original trip pay.  These provisions are set forth in the applicable CBA.

25.     Southwest also maintains attendance and reliability policies for flight crews that were negotiated with the relevant unions and are incorporated into the CBAs.  The purpose of these policies is to allow Southwest to monitor whether flight and ground crews work when scheduled, to ensure on-time operations, and to make sure Southwest is able to properly and safely staff its flights.  These policies enable Southwest to comply with comprehensive federal safety laws and regulations on work hours and staffing, including those related to duty period limitations, flight crew family medical leave, rest requirements, and aviation safety.  They also take into account Southwest's need to provide consistent, on-time service to its customers and to treat a highly mobile workforce fairly and consistently throughout its entire operation, regardless of which airport any given flight crew flies into and out of on any given day.

26.     Because flight attendant absences cause significant operational disruptions, Southwest has negotiated with the relevant union for provisions in the CBA to monitor and limit abuse of sick leave, which provisions were agreed upon by the union during the collective bargaining process in conjunction with Southwest's agreement to provide generous sick leave benefits.  The CBA permits Southwest to require a doctor's statement if a flight attendant is out sick for more than seven (7) consecutive calendar days, and  is also permitted, during irregular operations or when absenteeism is spiking, to institute a "state of emergency" ("SOE") and require

a doctor's notes to cover shorter absences. Southwest also is permitted under the flight attendant CBA – as well as other CBAs for other work groups – to assess points for employee absences and imposes progressive discipline when an employee accrues too many points under the relevant attendance and reliability policy. Potential discipline ranges from coaching to a written warning to possible termination, though terminations for absenteeism are extremely rare due to the flexibility built into the relevant CBA. That said, SOEs and points are necessary and important tools for which Southwest negotiated pursuant to the RLA bargaining process in order to prevent abuse and provide timely operations, all in exchange for agreeing to provide generous paid sick leave benefits.

**GROUND CREW**

27. Depending on the particular job in question, ground crew functions include performing maintenance work on aircraft, handling baggage, providing customer service at airport ticket counters and gates, and loading food/beverage items onto airplanes. These employees typically are paid based on hours worked and are scheduled to work five 8-hour days, per week.

28. Southwest has negotiated with the relevant unions and agreed in collective bargaining agreements to provides generous sick leave benefits to ground crew employees. Mechanics, for example, earn eight hours of sick leave each month, up to a maximum of 2,000 hours. When mechanics use sick leave, they are paid at their straight-time rate. In conjunction with providing these benefits, Southwest also has negotiated the right under its CBA to investigate the circumstances of any absence due to illness or injury (regardless of the number of workdays missed), and any fraudulent absence can be cause for discipline.

FP 44133269.1

## VI.    THE HFWA

29.     The HFWA imposes a comprehensive and pervasive sick leave benefit scheme on

Colorado employers.  The HFWA defines an employer as "any person acting directly or indirectly

in the interest of an employer in relation to an employee…"  29 U.S.C. § 203(d); C.R.S. § 8-13.3-

402, C.R.S. § 8-4-101(6).  The HFWA defines "employee" as "any person, including a migratory

laborer, performing labor or services for the benefit of an employer."  *See* C.R.S. § 8-13.3-402,

C.R.S. § 8-4-101(5).

30.     Colorado employers are required to provide two types of paid sick leave to their

employees:  public health emergency (PHE) leave and accrued leave.  C.R.S. § 8-13.3-404, 405.

31.     For PHE, Colorado employers must provide employees with up to two weeks of

paid leave (80 hours if full-time, less if part-time) for COVID-related needs, including illness with

COVID symptoms, quarantining or isolating due to COVID exposure, COVID testing, vaccination

and side effects, COVID-related needs of family, and inability to work due to health conditions

that may increase susceptibility or risk of COVID.  Employers cannot require documentation from

employees to show that leave is for COVID-related needs.  C.R.S. § 8-13.3-405.

32.     For accrued leave, employers are required to provide one hour of paid leave per 30

hours worked, up to 48 hours per year.  Accrued leave can be used for a wide range of health and

safety needs (for the employee or the employee's family), including any mental or physical illness,

injury or health condition that prevents work, diagnosis or treatment of conditions, preventive care

(including vaccination), and needs due to suffering domestic violence, sexual abuse, or criminal

harassment.  C.R.S. § 8-13.3-404.

33.     The HFWA provides that a CBA can be the basis for exemption from the HFWA

requirements.  C.R.S. § 8-13.3-415.  Contrary to the plain text of the statute, the CDLE has taken

the enforcement position that this exemption only applies if the terms of the CBA cover all the same conditions or needs, at the same pay rate, and with no stricter requirements (documentation, notice, etc.) than the HFWA.  Thus, under this provision as enforced by the CDLE, even if the CBA provides far more generous sick leave benefits than required by HFWA, the CBA cannot be the basis for exemption if it also includes provisions designed to curb sick leave abuse, even where the certified union responsible for negotiating the CBA with the employer has agreed to those provisions in exchange for the benefits provided by the employer.

34.     Under the HFWA, employees begin to accrue paid sick leave when employment with the employer begins and may use accrued paid sick leave as it is accrued, and an employee can carry over up to 48 hours of paid sick leave to the following year.  C.R.S. § 8-13.3-403(3).  An employee only is permitted to use up to forty-eight hours of paid sick leave each year, unless the employer selects a higher limit.  C.R.S. § 8-13.3-403(2)(a).

35.     The HFWA requires that employers allow use of sick time in increments as small as one hour, unless the employer allows paid sick leave to be taken in smaller increments of time. C.R.S. § 8-13.3-404(3).

36.     Under the HFWA, an employer may only require reasonable documentation that the paid sick leave is for a purpose authorized by the Law if an employee uses paid sick leave for four or more consecutive work days.  The HFWA prohibits employers from counting sick-leave absences towards discipline.  C.R.S. § 8-13.3-407(2)(b).

37.     Although the HFWA allows employers to promulgate policies requiring that employees give notice of the need to use sick leave, employers are prohibited from "deny[ing] paid sick leave to the employee based on noncompliance with such a policy."  C.R.S. § 8-13.3-404(2).

13

38.     The HFWA also imposes various recordkeeping and notice obligations on employers.  C.R.S. § 8-13.3-409.

39.     The CDLE has initiated  enforcement of the HFWA against Southwest, and Southwest is currently appealing an ALJ's order determining that Southwest's adherence to its collectively-bargained sick leave provisions "has violated nearly every HFWA requirement and protection." *See CDLE v. Southwest Airlines Co.*, Case number 21-0013, *1 (Mar. 15, 2022).  In addition to substantial financial penalties, the CDLE' citation purports to prohibit Southwest from requiring notice of sick leave usage, requiring reasonable documentation to support sick leave usage, and imposing flight attendant points, all of which are integral provisions in Southwest's CBAs that were negotiated with the unions in exchange for paid sick leave benefits.

**THE HFWA INTERFERES WITH, AND BURDENS, BOTH SOUTHWEST'S OPERATIONS AND INTERSTATE COMMERCE**

40.     The HFWA, as interpreted and enforced by the CDLE, imposes significant burdens on both Southwest's operations and interstate commerce.    By way of example and without limitation:

41.     The HFWA significantly interferes with Southwest's enforcement of nationwide attendance and reliability policies and will lead to flight delays and cancellations.  For instance, the HFWA's four-day minimum absence requirement for requesting medical verification of illness, practically speaking, substantially eliminates Southwest's ability to investigate flight and ground crew absences.  By eliminating Southwest's ability to request medical documentation for absences and issue discipline for attendance policy violations, the HFWA will lead to more employee absences, which will impact Southwest's service in the form of an increased number of flight delays and cancellations.

42.     There is substantial evidence of this.  Sick leave usage and absenteeism tend to spike on holidays, weekends, and for some work groups during time periods when pay rates reset to normal rates after being elevated to premium levels.  During these time periods, Southwest's only tool to return operations to normal is to enact SOEs and rely on attendance and discipline policies.  Operational data demonstrates that when SOEs are imposed, attendance levels return to normal after spiking in these situations.

43.     In negotiations, at least one union has already admitted to this discretionary usage of sick leave and suggested that Southwest will now need to offer double time or triple time pay to encourage employees to come to work.

44.     Similarly, FAA regulations set the minimum staffing levels for every commercial flight.  Without the requisite number of crewmembers on board, a plane cannot take off.  If a scheduled crewmember unexpectedly calls out sick, a replacement crewmember must be found through a process which often causes a delay in the flight's departure.  If a replacement crewmember cannot be found, the flight may be cancelled in its entirety.  And because flight crew schedules are built with a complex array of connections and transfers, a delayed departure due to an unexpected absence in one location can ripple across the system, leading to additional delays and possibly cancellations at other airports across the country.

45.     Similarly, if there is an increase in the number of ground crew employees who call in sick, Southwest will not have enough ground crew employees to perform maintenance on aircraft, handle baggage and/or prepare and load food and beverage items onto the airplane.  This will cause interruptions to Southwest's service in the form of an increase in flight delays and, potentially, cancellations.

46.     The HFWA also will require Southwest to increase the reserve pool headcount for flight crew personnel to guard against potential service interruptions caused by high levels of pilot and flight attendant sick calls.  And, even where high usage of sick leave is predictable, e.g., the Super Bowl, Mother's Day, Halloween, and all major holidays, increasing the reserve pool will not solve or alleviate the disruption to  Southwest's operations and interstate commerce, because the reserve flight crew personnel themselves are protected under the HFWA and can also call out sick without any ability for Southwest to monitor or limit abuse.  Accordingly, hiring more flight or ground crew personnel will only increase the costs of airline operations – it will not resolve the core problem of being required to comply with the HFWA's sick leave regime.  Further, the resulting significantly increased operational costs will lead to increases in fares.

47.     Permitting enforcement of the HFWA will expose Southwest to a patchwork of inconsistent state and municipal regulatory regimes, adversely affecting efficient, on-time air transportation.  Several of the airports to which Southwest flies are in jurisdictions with their own paid sick-leave regimes.  At least six other states have mandatory paid sick leave laws – Arizona, California, Connecticut, Maryland, Oregon, and Washington – and there are many more sick leave regimes at the local level.

48.     These sick leave regimes impose different (and inconsistent) obligations on employers and grant employees different rights with respect to paid leave.  For example, these regimes authorize different uses for sick leave, different accrual and annual carryover limits, different compensation rate formulas, different employee notification requirements, and different restrictions on when employers can request medical verification of an illness.  Complying with the laws of each state or municipality, including those in which a carrier operates (and over which it flies) means tracking each flight crewmember's hours worked and the locations in which they

worked on a given day and then calculating different accrued sick leave benefits for each employee (those calculations will differ for each employee and will even differ day-to-day for any given employee).  And although it does not happen as regularly as with flight crew members, even ground crew personnel work in multiple locations.  Often times, the tracking of hours worked and work locations is different from how duty time is tracked for pay purposes (especially for flight crew members), meaning an airline would have to maintain multiple systems for complying with separate administrative requirements.  Not only are the administrative costs of complying onerous and unreasonable, but attempts to comply simultaneously with these different regimes will cause mass confusion and expose Southwest to a flood of new lawsuits and enforcement proceedings.

## THE HFWA ALSO INTERFERES WITH, AND DESTABILIZES, THE COLLECTIVE BARGAINING PROCESS

49.     The HFWA, as interpreted and applied to Southwest by the CDLE, also frustrates the principal goals of Congress as reflected in the RLA to require the prompt and orderly settlement of disputes regarding terms of employment, and the making and maintaining of collective bargaining agreements in a manner that avoids any interruption to commerce and operations.  This frustration of goals occurs because the HFWA imposes a pervasive paid leave scheme that directly interferes with the bargaining process and undermines reliance by Southwest and its unions on core elements of existing collective bargaining agreements in a manner that is fundamentally destructive of the RLA bargaining process itself.

50.     The RLA collective bargaining process is a give-and-take endeavor, where each party gives up items that the other side wants or needs in exchange for receiving items that it wants or needs.   Southwest's sick leave and attendance policies are one example of this give-and-take process – whereby Southwest agreed to provide generous paid sick leave benefits in exchange for

CBA provisions that would allow Southwest to monitor and control abuse of the sick leave benefits.

51.     The HFWA, however, guts pivotal pieces of Southwest's various CBAs and replaces them with provisions that are directly contrary to the negotiated scheme.  This leaves Southwest with the negotiated obligation to provide benefits far more generous than required by the HFWA, but without the negotiated conditions under which those benefits were to be provided.  Had the unions come to Southwest at the bargaining table and asked for rules and restrictions like those imposed by the HFWA, Southwest would have been able to bargain for countervailing provisions that would allow it to control costs and continue to maintain efficient, timely, and predictable operations.

52.     Given that  the HFWA's provisions were not bargained, however, the unions are under no obligation to agree to anything in return.  This has had a significant destabilizing impact on the RLA bargaining process, as Southwest can no longer rely on receiving the benefit of its bargain.  Moreover, if Southwest is to preserve its ability to operate in an efficient, timely, and predictable matter, it must now request significant changes to CBAs that will offset the HFWA-required changes to the attendance polices.  Southwest knows from prior negotiations that the unions will be reluctant to agree to these changes – things like enforced minimum protection standards, changes to the reserve system, changes to compensation policies, and the elimination or significant curtailing of shift trading procedures.  As a result, the HFWA, as applied to Southwest, has significantly undermined Southwest's ability to make and maintain agreements in an orderly and prompt manner, thereby frustrating Congressional intent as reflected in the RLA.

## VII.    CLAIMS

**COUNT I**

**THE ADA PREEMPTS THE HFWA**

53.     Plaintiff re-alleges and incorporates herein each of the preceding allegations.

54.     The Supremacy Clause, Article VI, Clause 2, of the United States Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the Supreme Law of the land."

55.     Under the Supremacy Clause, federal law preempts any state or local regulation in an area in which Congress has expressly or impliedly exercised exclusive authority.

56.     Congress enacted the ADA to deregulate the airline industry; to ensure maximum reliance on competitive market forces; to encourage efficiency, innovation, and lower prices; and to meet the needs of consumers and the commerce of the United States.  To prevent states from undoing federal deregulation of air transportation, Congress enacted a broad express preemption provision.  The ADA expressly and broadly prohibits state and local governments from enacting or enforcing "a law, regulation or other provision having the force and effect of law related to a price, route, or service of an air carrier …"  49 U.S.C. § 41713(b).

57.     The HFWA's comprehensive and pervasive paid sick leave scheme is a law or regulation that significantly relates to s Southwest's prices, routes, and services, and thereby is preempted by the ADA.

58.     By way of example and without limitation, the HFWA relates to  Southwest's service and routes by interfering with its ability to enforce attendance and reliability policies designed to ensure on-time operations, which has already lead to delays and cancelled departures and will continue to do so.

59.     The HFWA also relates to Southwest's prices by making it necessary for Southwest to increase its headcount in order to cover the increased absences, which inevitably will increase Southwest's prices.

60.     Because the HFWA impermissibly regulates and relates to airline "prices, routes, or services," the ADA preempts the HFWA.

**COUNT II**

**THE HFWA VIOLATES THE COMMERCE CLAUSE OF THE U.S. CONSTITUTION**

61.     Plaintiff re-alleges and incorporates herein each of the preceding allegations.

62.     Article 1, Section 8, Clause 3, of the United States Constitution empowers Congress – and not states or municipalities – to "regulate Commerce with foreign Nations, and among the several States."   Accordingly, this clause limits the powers of state and local governments to enact laws affecting foreign and interstate commerce when a national, uniform policy is required.

63.     The United States Government has exclusive sovereignty of the airspace of the United States.   *See* 49 U.S.C. § 40103(a)(1).   Federal control of air travel is intensive and exclusive.  Uniformity in regulation of air transportation is a national necessity to ensure efficient airline operations.

64.     Southwest engages in interstate and foreign commerce as federally-regulated air carriers.

65.     The HFWA significantly burdens interstate commerce by causing flight delays and cancellations.  Those significant burdens are not offset by local benefits, in large part because Southwest already provides generous paid sick leave benefits and significant scheduling flexibility

for its employees.  The marginal benefit of the HFWA as applied to Southwest is far outweighed by its burden on commerce.

66.     The HFWA and similar laws enacted in other states and municipalities in which Southwest operates impose impermissible burdens on air transportation and interstate commerce.

67.     The evolving patchwork of state and local regulation of sick leave exposes Southwest to inconsistent and potentially conflicting state and local regulations.  Compliance with every state or local sick leave law imposed by jurisdictions in which Southwest operates is nearly impossible, and even if it were possible, it would be extremely burdensome.

68.     The burdens imposed by the HFWA are excessive in relation to its putative local benefits, particularly given that Southwest already provides generous paid sick leave benefits, including through CBAs negotiated with union representatives.

69.     The HFWA, therefore, impermissibly burdens interstate commerce and violates the Commerce Clause of the United States Constitution.

**COUNT III**

**THE RLA PREEMPTS THE HFWA**

70.     Plaintiff re-alleges and incorporates herein each of the preceding allegations.

71.     Congress' principal purpose in enacting the RLA was to prevent interruptions to the nation's transportation systems.   45 U.S.C. § 151a; *see, e.g.*, *Texas & N.O. R. Co. v. Brotherhood of Ry. & S.S. Clerks*, 281 U.S. 548, 565 (1930).  To this end, Section 2, First of the RLA mandates that "[i]t shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . . in order to avoid any interruption to commerce or to the operations of any carrier . . ." 45 U.S.C. § 152, First.  And further, Section 151a of the RLA separately states that

FP 44133269.1

one of the RLA's purposes is "to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions."

72.     The Supreme Court has described Section 2, First as "[t]he heart of the Railway Labor Act." *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377 (1969).  For this reason, the Court has held that the duty to make and maintain agreements without interruption to the carrier's operations is not "a mere statement of policy or exhortation to the parties." *Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 578 (1971).  Rather, Section 2, First sets forth an affirmative legal obligation. *See id.* at 581-82.

73.     The HFWA, however, "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 488 (10th Cir. 1998).

74.     The HFWA is not an isolated minimum employment standard that is compatible with Congressional goals as stated in the RLA.  Rather, the HFWA imposes a comprehensive and invasive paid sick leave scheme that frustrates the RLA bargaining process, including the free-play of economic forces, and broadly undermines employment relationships and collective bargaining agreements negotiated pursuant to that process.

75.     As a result, the HFWA has already, and will in the future, undermine the ability of Southwest and its unions to rely upon the trade-offs and related provisions of their collective bargaining agreements, thereby frustrating Southwest's ability to make and maintain agreements on a prompt and orderly basis, so as to avoid disruptions to commerce and operations. The HFWA, therefore, frustrates expressly-stated Congressional intent as reflected in the RLA, and is preempted by the RLA.

FP 44133269.1

## VIII.    PRAYER FOR RELIEF

76.    WHEREFORE, Plaintiff asks for the following relief:

a.    Judgment against Defendants declaring that the HFWA, as applied to Southwest:

  i.    Is preempted by the Airline Deregulation Act; and

  ii.   Violates the Commerce Clause of the United States Constitution; and

  iii.  Is preempted by the Railway Labor Act.

b.    An award to Southwest for its attorneys' fees and costs incurred in this action under 42 U.S.C. § 1988, and any other applicable law.

c.    Any other relief the Court may deem just and appropriate.

DATED this 27th day of May, 2022

By */s/ Micah Dawson*
Micah Dawson, #48263
Fisher & Phillips LLP
1125 17th Street, Suite 2400
Denver, CO 80202
Telephone: 303-218-3665
Facsimile: 303-218-3651
mdawson@fisherphillips.com

Robert A. Siegel, #64604 (CA)
O'Melveny& Myers LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: 213-430-6005
Facsimile: 213-430-6407
E-mail:  rsiegel@omm.com
(*Request for Admission to be filed*)

Adam P. KohSweeney, #229983 (CA)
O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone: 415-984-8700
Facsimile: 415-984-9701

FP 44133269.1

E-mail:   akohsweeney@omm.com
(*Request for Admission to be filed*)

*Attorneys for Plaintiff Southwest Airlines Co.*

FP 44133269.1